UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

VINCENT E. BOYD,

                Plaintiff,

v.                                            Case No. 11-CV-609-JPS

CAROLYN J. SCHULTZ
and JEFFREY S. ALLEN,

                Defendants.              ORDER

The plaintiff, Vincent E. Boyd ("Boyd"), filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 and was granted leave to proceed *in forma pauperis.* He claims that the defendants denied him dental care when he was an inmate at the Winnebago County Jail ("Jail"), in violation of his constitutional rights. Defendants Carolyn Schultz ("Nurse Schultz") and Jeffrey S. Allen, MD, ("Dr. Allen") have filed a motion for summary judgment, which will be addressed herein.[1]

1.      Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that

---

[1] On February 12, 2013, the court granted former defendant Mark Habeck's motion for summary judgment and former defendant Jeffrey D. Wolk's motion for summary judgment. Both motions were unopposed.

"might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

2.  Factual Background[2]

    2.1  Procedural Background

Boyd was held as a pretrial detainee at the Jail from June 12, 2010, until June 18, 2012. He claims that Nurse Schultz and Dr. Allen were deliberately indifferent to his serious medical needs between March 31, 2011, and July 6, 2011, when: (1) he was allegedly denied the extraction of his lower wisdom teeth because it was too costly; and (2) he was allegedly denied proper medication for his corresponding pain.

---

[2] Facts are taken from the Defendants' Proposed Findings of Fact and Boyd's Response to Defendants' Proposed Findings of Fact.

### 2.2 Nurse Schultz's and Dr. Allen's Backgrounds

During all relevant times, Nurse Schultz was employed as a registered nurse by Health Professionals, Ltd., and worked in the Health Service Unit ("HSU") at the Jail. Nurse Schultz is not licensed or authorized to prescribe or discontinue medications. Her responsibilities at the Jail HSU included responding to written Inmate Requests for Medical Care ("Medical Slips"), performing nursing assessments of inmates, management of medications, maintenance of medical records, and scheduling appointments for inmates to see the Jail physician, Dr. Allen. Nurse Schultz has access to regularly maintained records of the Jail HSU, including inmate medical records and charts, progress notes, Medical Slips, and inmate grievances, and she reviewed those documents for Boyd as it pertains to this matter.

Dr. Allen has been a licensed physician in the State of Wisconsin since 1989 and he is board certified in family medicine. Dr. Allen was employed as a physician at all relevant times and provided on-site health care services to inmates at the Jail up to a maximum of four hours per week. As a physician at the Jail, Dr. Allen had access to inmate medical records and charts, including progress and treatment notes, and he has reviewed those documents for Boyd as it pertains to this matter. Nursing staff at the Jail HSU would prearrange and schedule on-site appointments for inmates with Dr. Allen based upon written Medical Slips. Dr. Allen did not screen inmates to determine who would be seen and/or examined during his on-site hours at the Jail unless it was a prearranged follow-up appointment.

### 2.3 Inmate Access to Healthcare

When inmates enter the Jail they are informed that if they require non-emergency medical attention they must submit a Medical Slip. HSU staff

triage all Medical Slips received on a daily basis. If the request is deemed urgent or emergent in nature, arrangements will be made for a same-day appointment for evaluation by a health care provider. HSU nursing staff sees inmates during Sick Call, at which time they can determine if the inmate should be seen by a doctor. When an inmate reports a significant problem or is seen by a nurse or doctor, it is noted in the inmate's HSU chart.

There is no on-site dentist at the Jail. When deemed medically necessary, inmates are referred to off-site dentists for dental care and treatment. Cost of care is not a factor in treatment decisions regarding inmates, however, the treatment must be medically necessary.

2.4     Boyd's Alleged Wisdom Tooth Pain and Treatment Received

On March 31, 2011, Boyd submitted a Medical Slip indicating that his bottom left wisdom tooth was causing pain and swelling in his gums. In response, Nurse Schultz scheduled Boyd to see Dr. Allen that day.

Dr. Allen examined Boyd on March 31, 2011, with Nurse Schultz present. During the appointment, Boyd complained that he had been experiencing pain near his lower left wisdom tooth for three days and requested that an oral surgeon extract his lower wisdom teeth. Upon examination, Dr. Allen noted that Boyd's lower right wisdom tooth, which he inadvertently recorded as tooth #17 instead of tooth #32, was emerging or erupting through his gum tissue in a straight manner. Dr. Allen further noted that Boyd's lower left gum tissue had mild swelling, no purulence,[3] no visible decay, and that Boyd had no facial swelling and normal lymph nodes. Dr. Allen also observed after testing that Boyd had no temporomandibular joint

---

[3]Purulence is defined as "The condition of containing or forming pus." STEDMAN'S MEDICAL DICTIONARY 1607 (28th Ed. 2006).

("TMJ") tenderness and did not have any problems opening his mouth. There was no sign of infection. Both Dr. Allen and Nurse Schultz asked if the cavity in tooth #18 was causing problems and Boyd stated he was unsure of the exact source of the pain.

Based on his examination, Dr. Allen determined that it was not medically necessary for Boyd to have his lower wisdom teeth immediately extracted. Dr. Allen and Nurse Schultz advised that the plaintiff would need an oral surgeon to extract the teeth and the Jail would not pay for it. Dr. Allen prescribed 500 milligrams of Naproxen, to be taken twice daily for ten days in order to treat Boyd's complaint of pain and noted inflammation. Naproxen is used to treat pain, tenderness, swelling, fever, and toothaches.

Nurse Schultz established a Medication Administration Record ("MAR") for Boyd and recorded that corrections officers were to provide him with one tablet of Naproxen twice daily for ten days starting on April 1, 2011. Boyd filed an Inmate Grievance Form with the Jail administration on March 31, 2011, after his appointment with Dr. Allen, and asserted that he required emergency dental treatment and extraction of his lower wisdom teeth by an oral surgeon, and that he believed Dr. Allen and Nurse Schultz were deliberately indifferent for failing to make such a referral.

On April 4, 2011, Boyd filed a Medical Slip stating that the medication was not helping his tooth pain. Nurse Schultz responded in writing the same day and indicated that she would follow-up with Dr. Allen to discuss Boyd's prescribed medication. That day, Nurse Schultz consulted with Dr. Allen by telephone and indicated that Boyd was still complaining of pain related to his wisdom teeth. Although Boyd had only been taking Naproxen for approximately three days, which Dr. Allen did not believe was long enough

Page 5 of 20

Case 2:11-cv-00609-JPS    Filed 05/15/13    Page 5 of 20    Document 87

to begin to effectively treat his symptoms, Dr. Allen ordered that Boyd's medication be changed from Naproxen to 800 milligrams of Ibuprofen, to be taken twice daily for fourteen days. Nurse Schultz recorded on Boyd's MAR that Naproxen should be discontinued and that Boyd be provided with four 200 milligram tablets of Ibuprofen twice daily for fourteen days.

On April 7, 2011, Dr. Allen conducted a follow-up examination of Boyd and reviewed his March 31, 2011 grievance form. Upon examination, Dr. Allen noted that Boyd's lower left wisdom tooth (#17) had not emerged or erupted. He further noted that there was minor gum tissue swelling, no purulence or drainage, and no jaw tenderness. Boyd's lower right wisdom tooth (#32) was observed to be partially erupted. Dr. Allen further observed that Boyd had normal lymph nodes, no TMJ clicking or muscle tenderness, and no sign of infection. Dr. Allen informed Boyd that erupting wisdom teeth, without more—i.e., infection or crowding of other teeth—did not require immediate extraction and did not constitute a dental emergency. Dr. Allen ordered a mandible x-ray to confirm whether Boyd's wisdom teeth were emerging in a straight manner and were not crowding his other teeth. He further ordered that Boyd should be placed on a soft diet to address any discomfort while eating. Boyd informed Dr. Allen and Nurse Schultz that the medication was not working because he was still in severe pain.

On April 8, 2011, Nurse Schultz completed a soft diet order for Boyd and provided it to the kitchen staff. That day, Boyd also had mandible x-rays taken at the Jail. The radiologist, Dr. Elliot Wagner, recorded that Boyd had a normal ossification pattern, no fractures, no loose teeth, and no TMJ dislocation. Dr. Wagner concluded that Boyd had a normal mandible.

Page 6 of 20

Case 2:11-cv-00609-JPS   Filed 05/15/13   Page 6 of 20   Document 87

Boyd submitted a Medical Slip to the HSU on April 10, 2011, indicating that both lower wisdom teeth were still causing him pain. Nurse Schultz responded in writing the following day that she had scheduled an appointment for Boyd to be seen by Dr. Allen during his next on-site visit.

On April 14, 2011, Dr. Allen met with Boyd for a follow-up appointment and reviewed the findings of the x-rays and radiology report. Dr. Allen noted that crowding was not an issue as there appeared to be adequate space in front of each mandibular wisdom tooth on the x-rays. Despite a lack of objective findings, Dr. Allen ordered that Boyd be sent to an offsite dentist, Jeffrey Wolk, DDS ("Dr. Wolk"), for further examination in regard to his complaints of wisdom tooth pain. Nurse Schultz scheduled an April 22, 2011, off-site appointment for Boyd to be seen by Dr. Wolk, a general dentist in Oshkosh, Wisconsin.

Dr. Allen's prior April 4, 2011 order that Boyd be provided with 800 milligrams of Ibuprofen twice daily for fourteen days expired on April 18, 2011. On April 20, 2011, Boyd submitted a Medical Slip stating that his wisdom teeth were continuing to cause him pain and that the Ibuprofen was not helping. Nurse Schultz responded in writing on April 22, 2011, by indicating that she would review his dental records with Dr. Allen after his off-site dental visit, which was scheduled for later that same day.

On April 22, 2011, Boyd was transported off-site to Dr. Wolk's office for an examination of his lower wisdom teeth to determine if they needed to be extracted. Upon examination, Dr. Wolk recorded in his progress note that Boyd had normal range of motion when opening his mouth, his gingiva was

Page 7 of 20

Case 2:11-cv-00609-JPS   Filed 05/15/13   Page 7 of 20   Document 87

pink with no exudate,[4] and he had no visible swelling or abscess. Dr. Wolk continued by noting that Boyd was tender to palpation and periodontal probing and appeared to have a low pain threshold. Dr. Wolk recorded that Boyd's lower left wisdom tooth (#17) was un-erupted and his lower right wisdom tooth (#32) was partially erupted. Dr. Wolk felt Boyd's oral hygiene was good as there was no visible plaque. He concluded in his progress note that having Boyd's lower wisdom teeth extracted was non-emergent and not required in the immediate future.

Dr. Wolk also completed a health care referral physician evaluation form which was provided to the Jail HSU. His diagnosis was that Boyd's lower left wisdom tooth (#17) was un-erupted and sore, but did not have an abscess.[5] He also noted that Boyd's lower right wisdom tooth (#32) was partially erupted, not as sore, and did not have an abscess. Under the proposed plan of care, Dr. Wolk recommended that Boyd's lower wisdom teeth be removed at some time in the future, but that it was not an emergency requiring immediate attention. Dr. Wolk's referral form did not provide any recommendations in regard to pain medication.

Nurse Schultz spoke with Dr. Wolk via telephone on April 22, 2011, and recorded that Dr. Wolk felt the condition of Boyd's wisdom teeth was not emergent or urgent and that immediate extraction was not required. Nurse Schultz also recorded that Dr. Wolk indicated if Boyd could pay for

---

[4]Exudate is defined as "Any fluid or semisolid that has exuded out of a tissue or its capillaries, more specifically because of injury or inflammation." STEDMAN'S MEDICAL DICTIONARY 688 (28th Ed. 2006).

[5]An abscess is "A circumscribed collection of purulent exudate frequently associated with swelling and other signs of inflammation." STEDMAN'S MEDICAL DICTIONARY 5 (28th Ed. 2006).

the extraction of his lower wisdom teeth upfront, an oral surgeon might extract his teeth, but it was not currently necessary.

That same day, Nurse Schultz discussed Dr. Wolk's findings with Dr. Allen via telephone, including the fact that Dr. Wolk did not find evidence of an abscess or infection, and that he did not believe extraction of Boyd's wisdom teeth was urgent or emergent, nor was extraction currently necessary. Dr. Allen ordered that Boyd should be given extra strength Tylenol (1000 milligrams) twice daily for seven days based on his continued complaints of pain. Nurse Schultz recorded on Boyd's MAR that he was to be given two 500 milligram tablets of extra strength Tylenol twice daily for seven days.

Later in the day on April 22, 2011, Boyd wrote a letter to Captain Habeck claiming that Dr. Wolk felt his lower wisdom teeth "definitely need to come out right away." Boyd's letter continued by alleging that Nurse Schultz thwarted Dr. Wolk's recommended referral to an oral surgeon as a cost cutting measure because the Winnebago County refused to pay for the extraction. Boyd asserted in the letter that the Jail medical staff was forcing him to "endure unnecessary pain and suffering" by not allowing the extraction of his lower wisdom teeth. (Schultz Decl. ¶¶ 26, 59, Ex. 4, pgs. 5-6.)

On April 28, 2011, Captain Habeck responded to Boyd's letter and explained that, contrary to Boyd's assertion, Dr. Wolk concluded that Boyd's dental situation was non-emergent and treatment was not medically necessary at the present time. Captain Habeck additionally noted that Boyd could proceed with extraction of his lower wisdom teeth, but since it would be an elective procedure, he would be responsible for the associated costs.

Captain Habeck provided Boyd with Dr. Wolk's address in case he required further clarification about his findings.

On April 28, 2011, Boyd submitted a Medical Slip to the HSU complaining that the extra strength Tylenol was not working as he was experiencing continued pain in his lower wisdom teeth and that the medication was upsetting his stomach. Dr. Allen's prior April 22, 2011 order that Boyd should be provided with extra strength Tylenol for seven days expired on the evening of April 29, 2011. Nurse Schultz responded in writing to Boyd's Medical Slip on May 2, 2011, indicating that he had routinely failed to take the properly prescribed dose of extra strength Tylenol and had informed her on April 26, 2011, that he was no longer experiencing any pain. Nurse Schultz further indicated that Boyd had never previously complained that Ibuprofen or Tylenol were upsetting his stomach, but that she would follow-up with Dr. Allen in regard to his medication.

On May 3, 2011, Boyd submitted a Medical Slip to the HSU claiming that Nurse Schultz "lied" in her May 2, 2011 written response as he allegedly told her and several other nurses that the medication he was taking was upsetting his stomach. He also asserted that his lower wisdom teeth constituted a dental emergency, were still causing him pain, and required immediate extraction. On May 4, 2011, Boyd submitted a Medical Slip to the HSU claiming that his wisdom teeth were continuing to cause him pain and that Dr. Wolk felt the teeth needed to be extracted "as soon as possible." Boyd continued by stating that Nurse Schultz refused to make an appointment to have his teeth extracted because "transport would be too far and oral surgery would cost too much." (Schultz Decl. ¶¶ 8, 67, Ex. 1, pg. 7.)

Page 10 of 20

Case 2:11-cv-00609-JPS   Filed 05/15/13   Page 10 of 20   Document 87

Nurse Schultz responded in writing to both of Boyd's Medical Slips on May 5, 2011, confirming that she had no knowledge the medications he was taking upset his stomach, that Dr. Wolk did not feel the extraction of his wisdom teeth were emergent or urgent, and that she would address Boyd's medication concerns with Dr. Allen. Later that day, Nurse Schultz contacted Dr. Allen via telephone and indicated that Boyd was complaining that the medication upset his stomach and was not helping his pain.

Based on Boyd's complaint of stomach pain, Dr. Allen ordered that he not be provided Ibuprofen. Dr. Allen additionally prescribed 20 milligrams of Omeprazole, a proton pump inhibitor which helps protect the lining of the stomach, to be taken twice daily for fourteen days. He further ordered that Boyd be given 500 milligrams of Naproxen for fourteen days to address his complaint of pain, in part, because he did not believe Boyd previously took a long enough course of the drug in order for it to be effective, and also because Naproxen is gentler on the stomach than Ibuprofen. Nurse Schultz updated Boyd's MAR to reflect Dr. Allen's new orders.

Boyd submitted follow-up Medical Slips to the HSU on May 7 and May 10, 2011, complaining that he was being denied proper dental treatment because he could not have his wisdom teeth extracted, and that he was still experiencing excruciating pain which was affecting his ability to sleep, and that it hurt to swallow. Nurse Schultz responded in writing to Boyd's Medical Slips on May 9 and May 11, 2011, explaining that Dr. Wolk did not feel it was necessary for his wisdom teeth to be immediately extracted and that she would discuss his medication issues with Dr. Allen.

On May 11, 2011, Nurse Schultz also initiated a 72-hour pain log for Boyd, whereby corrections officers were to document his activity, including

any complaints of pain and whether Boyd appeared to exhibit signs of discomfort. Nurse Schultz informed the officers in writing that the pain log was started because of Boyd's complaint that severe tooth pain was disabling him. The pain log completed by the corrections officers between May 11 and May 15, 2011, revealed that Boyd had no complaints of pain on May 12, May 13, or May 14, 2011. Boyd was additionally observed during this time-frame to be conversing with inmates, sitting in a bunk at the law library, and sleeping. There was no indication on the log that Boyd appeared to be in any discomfort at any time.

On May 13, 2011, Boyd signed a refusal of medical services form in regard to the prescription of Omeprazole. At Boyd's request, Omeprazole was discontinued.

Boyd submitted Medical Slips to the HSU on May 14, May 15, and May 16, 2011, complaining that his teeth continued to be sore, he was in severe pain, the prescribed medication was not helping or was upsetting his stomach, his gums were bleeding, and that he needed to be seen by a dentist. Nurse Schultz responded to each of Boyd's complaints in writing reiterating Dr. Wolk's opinion that his wisdom teeth did not require immediate extraction and that he had refused to be compliant with his ordered medications.

On May 16, 2011, Nurse Schultz examined Boyd's mouth based on his continued complaints of pain. She recorded that his lower right wisdom tooth (#32) was partially coming in and appeared to be the same as during her last check. She also recorded that Boyd's gums were pink with no bleeding or drainage. Boyd insisted that his wisdom teeth needed to be extracted and that Nurse Schultz must be blind if she could not see the

Page 12 of 20

Case 2:11-cv-00609-JPS   Filed 05/15/13   Page 12 of 20   Document 87

bleeding and swelling. Boyd additionally stated that the pain medication was hurting his stomach and nothing was being done to remedy the situation. That day, Nurse Schultz contacted Dr. Allen by telephone and informed him that Boyd was still complaining of lower wisdom tooth pain. Nurse Schultz and Dr. Allen jointly determined that Boyd should be sent to another off-site dentist for further evaluation and a second opinion regarding his lower wisdom teeth.

Nurse Schultz scheduled a May 19, 2011, off-site dental appointment for Boyd to be seen by Allen Deaton, DDS ("Dr. Deaton"), a general dentist at Midwest Dental in Oshkosh, Wisconsin. On May 19, 2011, Dr. Allen's May 5, 2011 order that Boyd should be provided 500 milligrams of Naproxen twice daily for fourteen days expired. That day, Boyd was also taken to an off-site dental appointment where he was examined by Dr. Deaton in regard to his complaints of lower wisdom tooth pain.

Dr. Deaton completed a referral physician evaluation form after conducting his examination which noted, in part, that Boyd's upper wisdom teeth were impacted and asymptomatic. He further recorded that Boyd's lower right wisdom tooth (#32) had firm gingiva, no exudate, and was negative to palpation. Dr. Deaton also recorded that the tissue surrounding Boyd's lower left wisdom tooth (#17) was slightly swollen and positive to palpation with exudate on probing. He further noted that tooth #18 - the second molar immediately in front of the lower left wisdom tooth - had a cavity and was positive to percussion. Dr. Deaton diagnosed Boyd's lower left wisdom tooth (#17) with pericornitis, an infection of the surrounding gum tissue. His proposed care plan included extracting tooth #17 and providing a filling for tooth #18. Dr. Deaton did not make any orders

regarding pain medication or change the medications that Boyd was prescribed. Nurse Schultz coordinated a follow-up dental appointment for Boyd with Dr. Deaton at Midwest Dental for June 16, 2011.

On May 20, 2011, Boyd submitted a Medical Slip indicating that his pain medication (Naproxen) had stopped. The next day, 500 milligrams of Naproxen, to be taken twice daily for fourteen days, was ordered for Boyd. Nurse Schultz updated the order for Boyd's Naproxen on his MAR. Boyd did not file any Medical Slips with the HSU regarding his wisdom teeth between May 21 and June 9, 2011.

On June 9, 2011, Boyd submitted a Medical Slip indicating that the order for his pain medication (Naproxen) had ended and that he still had tooth pain. That day, Nurse Schultz contacted Dr. Allen by telephone and stated that Boyd was requesting continued medication for wisdom tooth pain. They discussed Dr. Deaton's findings and the fact that Boyd had a follow-up appointment with Dr. Deaton on June 16, 2011. Based on their discussion, Dr. Allen ordered that Boyd's prescription for 500 milligrams of Naproxen be continued for an additional fourteen days. Nurse Schultz updated the order for Boyd's Naproxen on his MAR and informed Boyd that a follow-up dental appointment was scheduled to occur shortly.

Boyd was unable to attend the June 16, 2011 dental appointment with Dr. Deaton because he was required to appear by telephone at a three-day criminal trial taking place in Tennessee. Nurse Schultz rescheduled Boyd's follow-up dental appointment with Dr. Deaton for July 6, 2011.

Dr. Allen's June 9, 2011 order to continue Boyd's Naproxen for fourteen days ended on the evening of June 23, 2011. Boyd did not file any Medical Slips in regard to his wisdom teeth between June 10 and June 25,

2011. On June 26, 2011, Boyd filed a Medical Slip claiming that he needed more pain medication for his teeth even though, in his opinion, "they do not help at all." (Schultz Decl. ¶¶ 8, 106, Ex. 1, pg. 16.) The following day, Dr. Allen responded in writing to Boyd's Medical Slip, and stated that Boyd would not be provided medication (Naproxen) if he did not feel it was helping, which Dr. Allen believed was due to Boyd's noncompliance in taking the medication.

On June 29, 2011, Boyd filed a Medical Slip claiming that he was still experiencing extreme pain. He also wanted to know when his follow-up dental appointment with Dr. Deaton would occur to avoid another scheduling conflict.

Nurse Schultz responded in writing to Boyd's Medical Slip the next day and stated that she could not tell him the date when his follow-up dental appointment was scheduled due to security concerns. She also conferred via telephone with another medical professional, a Nurse Practitioner named Sandy, because Dr. Allen was not available, which resulted in a re-order of 500 milligrams of Naproxen for thirty days.

Boyd did not file any Medical Slips between June 30 and July 6, 2011. On July 6, 2011, Boyd was examined by Dr. Deaton for his follow-up off-site appointment at Midwest Dental in Oshkosh, Wisconsin. Dr. Deaton completed a referral physician evaluation form for the Jail after completing his examination. He noted that tooth #17 (lower left wisdom tooth) had pink tissue with no swelling or exudate. Dr. Deaton further recorded that Boyd informed him the tooth was now asymptomatic. His note also recorded that tooth #18 had a cavity which was negative to percussion and palpation, but positive in response to cold. Dr. Deaton diagnosed tooth #17 with

Page 15 of 20

Case 2:11-cv-00609-JPS   Filed 05/15/13   Page 15 of 20   Document 87

"pericornitis, resolved" and did not extract the tooth. He provided Boyd with an amalgam or filling for the cavity on tooth #18. Dr. Deaton's proposed care plan recommended extraction of all of Boyd's wisdom teeth (#'s 1, 16, 17, and 32) at some point in the future as a routine procedure but that it was "not an emergency," and not immediately necessary. (Schultz Decl. ¶¶ 87, 118, Ex. 9, pg. 2.) He recorded in his progress note that he preferred to wait to extract any of Boyd's wisdom teeth until all four were ready for extraction. Dr. Deaton did not indicate that a follow-up dental appointment with his office was necessary or required in regard to Boyd's wisdom teeth.

When Boyd returned to the Jail from the dental appointment on July 6, 2011, he signed a refusal of medical services form and refused to take Naproxen, which was scheduled to last until August 6, 2011. Boyd wrote on the refusal form the pain from his wisdom teeth had subsided.

3.   Analysis

The defendants contend that Nurse Schultz and Dr. Allen are entitled to judgment as a matter of law because they were not deliberately indifferent to a serious medical need. According to the defendants, Boyd's wisdom teeth were not a serious medical condition and, even if they were, they were not deliberately indifferent to Boyd's condition.

Boyd contends that the court should deny the defendants' motion for summary judgment because issues of material fact exist and there is sufficient evidence upon which a reasonable jury could find in his favor. He contends that his dental problems were a serious medical condition and that Nurse Schultz and Dr. Allen were deliberately indifferent to that condition.

Boyd's claim arises under the Due Process Clause of the Fourteenth Amendment, which affords pretrial detainees the same protection against

deliberate indifference as the Eighth Amendment guarantees to the convicted. *Smith v. Knox County Jail*, 666 F.3d 1037, 1039 (7th Cir. 2012) (*citing Williams v. Rodriguez*, 509 F.3d 392, 401 (7th Cir. 2007)). Accordingly, when considering a pretrial detainee's claim of inadequate medical care, the analogous standard under the Eighth Amendment is often used. *Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 764 (7th Cir. 2002) (citations omitted).

"The Eighth Amendment safeguards the prisoner against a lack of medical care that may result in pain and suffering which no one suggests would serve any penological purpose." *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (quoting *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (internal quotations omitted)). Prison officials violate the Constitution if they are deliberately indifferent to a prisoner's serious medical need. *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). A prisoner's claim for deliberate indifference must establish: "(1) an objectively serious medical condition; and (2) an official's deliberate indifference to that condition." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (quoting *Arnett*, 658 F.3d at 750).

A serious medical need is a condition that has been diagnosed by a doctor as mandating treatment or one that is so obvious that even a lay person would easily recognize the need for a doctor's attention. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005); *Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997). Dental care is one of the most important needs of inmates. *See Board v. Farnham*, 394 F.3d 469, 480 (7th Cir. 2005); *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001). Here, Boyd's dental symptoms—substantial pain, erupting wisdom teeth, and a cavity—are less serious compared with other dental care constitutional cases. *See Wynn*, 251 F.3d at 593 (concluding

that inmate's allegations of bleeding, headaches, "disfigurement," and inability to chew food without dentures demonstrated a serious medical need); *Cooper v. Schriro*, 189 F.3d 781, 783-84 (8th Cir. 1999) (reversing dismissal of complaint alleging failure to treat painful, decayed and cracked teeth"); *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) (reversing dismissal of complaint alleging that failure to provide dental care caused extreme pain, tooth deterioration, and inability to eat properly); *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (reversing grant of summary judgment where prisoner produced evidence of failure to treat bleeding gums, broken teeth, and inability to eat properly). On the other hand, during the relevant three-and-one-half month time period, Boyd saw a medical professional at the Jail on an almost weekly basis and the defendants referred him to off-site dentists on three separate occasions to address his medical needs, which may indicate that Boyd suffered from a serious medical need. In any event, the court need not fully resolve the question of whether Boyd's condition satisfies the legal standard for a serious medical need because, as explained below, the court concludes that Boyd cannot meet the second prong of his Eighth Amendment claim.

To show that the defendants were deliberately indifferent, Boyd has a burden to establish that they were aware of but intentionally or recklessly disregarded his serious medical need. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008). The court defers to a medical professional's treatment decisions "unless 'no minimally competent professional would have so responded under those circumstances.'" *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (quoting *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998)).

Here, there is no evidence to suggest that the defendants acted unreasonably. From the time that Boyd first complained about teeth pain and sought removal of his wisdom teeth, Nurse Schultz promptly responded to his Medical Slips and consulted with Dr. Allen who, in turn, promptly examined Boyd or provided direction to Nurse Schultz as to a course of treatment. They tried different medications, gave him a soft diet, ordered mandible x-rays, and referred him to two separate off-site dentists. Both dentists agreed with Dr. Allen's assessment that Boyd did not present with a medical emergency necessitating immediate removal of his wisdom teeth. At Boyd's second off-site appointment with Dr. Deaton, when he was going to have wisdom tooth #17 removed, the tooth was found to be asymptomatic and Boyd reported that it was not causing him pain anymore.

The record shows one factual dispute: the parties dispute whether Boyd refused his prescribed medication. According to Boyd, he only refused it twice and other times he may not have taken it, was due to him not being woken up, being in the law library, or the medication not being offered to him. However, Boyd does not offer specific information as to when this occurred or who was responsible. The defendants, on the other hand, assert that Boyd refused his medication on multiple occasions. In any event, this factual dispute is immaterial and does not preclude resolution via summary judgment because Boyd does not attribute any missed medication to either defendant. Rather, the record shows that the defendants promptly addressed Boyd's reports of pain. When Boyd stated the Naproxen was not working, Nurse Schultz consulted with Dr. Allen who switched Boyd to Ibuprofen. Later, after Boyd complained that the Ibuprofen caused him to have an upset stomach, Dr. Allen went back to Naproxen along with Omeprazole, to

protect the stomach lining. This is not a case of prison officials withholding pain medication as a "gratuitous cruelty." *See Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999); *Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002); *Murphy v. Walker*, 51 F.3d 714, 720 (7th Cir. 1995).

The record shows that Nurse Schultz and Dr. Allen's treatment of Boyd was grounded in professional judgment and was reasonable. *See Jackson v. Kotter*, 541 F.3d 688, 698 (7th Cir. 2008); *Johnson v. Doughty*, 433 F.3d 1001, 1014 (7th Cir. 2006). As such, no reasonable factfinder could conclude that the defendants were deliberately indifferent to Boyd, and the defendants are entitled to summary judgment of Boyd's claims.

Accordingly,

IT IS ORDERED that defendants Allen and Schultz's motion for summary judgment (Docket #63) be and the same is hereby GRANTED.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 15th day of May, 2013.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge